# ASPEN SKIING CO. *v.* ASPEN HIGHLANDS SKIING CORP.

No. 84–510.   Argued March 27, 1985—Decided June 19, 1985

586

STEVENS, J., delivered the opinion of the Court, in which all other Members joined, except WHITE, J., who took no part in the decision of the case.

*Richard M. Cooper* argued the cause for petitioner. With him on the briefs were *Edward Bennett Williams, Harold Ungar, David G. Palmer,* and *William W. Maywhort.*

*Tucker K. Trautman* argued the cause for respondent. With him on the brief were *John H. Evans, Owen C. Rouse,* and *John H. Shenefield.**

JUSTICE STEVENS delivered the opinion of the Court.

In a private treble-damages action, the jury found that petitioner Aspen Skiing Company (Ski Co.) had monopolized the market for downhill skiing services in Aspen, Colorado. The question presented is whether that finding is erroneous as a matter of law because it rests on an assumption that a firm with monopoly power has a duty to cooperate with its smaller rivals in a marketing arrangement in order to avoid violating § 2 of the Sherman Act.[1]

I

Aspen is a destination ski resort with a reputation for "super powder," "a wide range of runs," and an "active night life," including "some of the best restaurants in North America." Tr. 765–767. Between 1945 and 1960, private investors independently developed three major facilities for downhill skiing: Aspen Mountain (Ajax),[2] Aspen Highlands

---

*Robert E. Cooper* and *Theodore B. Olson* filed a brief for American Airlines, Inc., as *amicus curiae* urging reversal.

[1] The statute provides, in relevant part:

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . . ." 15 U. S. C. § 2.

[2] Ski Co. developed Ajax in 1946. The runs are quite steep and primarily designed for expert or advanced intermediate skiers. The base area of Ajax is located within the village of Aspen.

(Highlands),[3] and Buttermilk.[4]   A fourth mountain, Snowmass,[5] opened in 1967.

The development of any major additional facilities is hindered by practical considerations and regulatory obstacles.[6] The identification of appropriate topographical conditions for a new site and substantial financing are both essential. Most of the terrain in the vicinity of Aspen that is suitable for downhill skiing cannot be used for that purpose without the approval of the United States Forest Service.   That approval is contingent, in part, on environmental concerns. Moreover, the county government must also approve the

---

[3] In 1957, the United States Forest Service suggested that Ajax "was getting crowded, and . . . that a ski area ought to be started at Highlands." Tr. 150.   Whipple V. N. Jones, who owned an Aspen lodge at the time, discussed the project with Ski Co. officials, but they expressed little interest, telling him that they had "plenty of problems at Aspen now, and we don't think we want to expand skiing in Aspen." *Id.*, at 150–151.   Jones went ahead with the project on his own, and laid out a well-balanced set of ski runs: 25% beginner, 50% intermediate, 25% advanced.   The base area of Highlands Mountain is located 1½ miles from the village of Aspen.   *Id.*, at 154.   Respondent Aspen Highlands Skiing Corporation provides the downhill skiing services at Highlands Mountain.   Throughout this opinion we refer to both the respondent and its mountain as Highlands.

[4] In 1958, Friedl Pfeiffer and Arthur Pfister began developing the ranches they owned at the base of Buttermilk Mountain into a third ski area.   Pfeiffer, a former Olympian, was the director of the ski school for Ski Co., and the runs he laid out were primarily for beginners and intermediate skiers.   More advanced runs have since been developed.   The base area of Buttermilk is located approximately 2¼ miles from the village of Aspen.   *Id.*, at 152, 1471–1472, 1526; Deposition of Paul Nitze 6–7.

[5] In the early 1960's William Janss, a former ski racer, and his associates had acquired three ranches in the Snowmass Valley, and had secured Forest Service permits for a ski area.   The developer sold the company holding the permits to Ski Co. to allow it to develop a downhill skiing facility for the project, leaving him to develop the land at the base of the site.   A fairly balanced mountain was developed with a mixture of beginner, intermediate, and advanced runs.   *Id.*, at 14–16; Tr. 1475–1476.   The base area of Snowmass is eight miles from the village of Aspen.

[6] *Id.*, at 378–379, 638, 2040–2051, 2069–2070, 2078–2082.

project, and in recent years it has followed a policy of limiting growth.

Between 1958 and 1964, three independent companies operated Ajax, Highlands, and Buttermilk. In the early years, each company offered its own day or half-day tickets for use of its mountain. *Id.*, at 152. In 1962, however, the three competitors also introduced an interchangeable ticket.[7] *Id.*, at 1634. The 6-day, all-Aspen ticket provided convenience to the vast majority of skiers who visited the resort for weekly periods, but preferred to remain flexible about what mountain they might ski each day during the visit. App. 92. It also emphasized the unusual variety in ski mountains available in Aspen.

As initially designed, the all-Aspen ticket program consisted of booklets containing six coupons, each redeemable for a daily lift ticket at Ajax, Highlands, or Buttermilk. The price of the booklet was often discounted from the price of six daily tickets, but all six coupons had to be used within a limited period of time—seven days, for example. The revenues from the sale of the 3-area coupon books were distributed in accordance with the number of coupons collected at each mountain. Tr. 153, 1634–1638.

In 1964, Buttermilk was purchased by Ski Co., but the interchangeable ticket program continued. In most seasons after it acquired Buttermilk, Ski Co. offered 2-area, 6- or 7-day tickets featuring Ajax and Buttermilk in competition with the 3-area, 6-coupon booklet. Although it sold briskly, the all-Aspen ticket did not sell as well as Ski Co.'s multiarea ticket until Ski Co. opened Snowmass in 1967. Thereafter,

---

[7] Friedl Pfeiffer, one of the developers of Buttermilk, initiated the idea of an all-Aspen ticket at a luncheon with the owner of Highlands and the President of Ski Co. Pfeiffer, a native of Austria, informed his competitors that " '[i]n St. Anton, we have a mountain that has three different lift companies—lifts owned by three different lift companies. . . . We sell a ticket that is interchangeable.' It was good on any of those lifts; and he said, 'I think we should do the same thing here.' " *Id.*, at 153.

the all-Aspen coupon booklet began to outsell Ski Co.'s ticket featuring only its mountains. Record Ex. LL; Tr. 1646, 1675–1676.

In the 1971–1972 season, the coupon booklets were discontinued and an "around the neck" all-Aspen ticket was developed. This refinement on the interchangeable ticket was advantageous to the skier, who no longer found it necessary to visit the ticket window every morning before gaining access to the slopes. Lift operators at Highlands monitored usage of the ticket in the 1971–1972 season by recording the ticket numbers of persons going onto the slopes of that mountain. Highlands officials periodically met with Ski Co. officials to review the figures recorded at Highlands, and to distribute revenues based on that count. *Id.*, at 1622, 1639.

There was some concern that usage of the all-Aspen ticket should be monitored by a more scientific method than the one used in the 1971–1972 season. After a one-season absence, the 4-area ticket returned in the 1973–1974 season with a new method of allocating revenues based on usage. Like the 1971–1972 ticket, the 1973–1974 4-area ticket consisted of a badge worn around the skier's neck. Lift operators punched the ticket when the skier first sought access to the mountain each day. A random-sample survey was commissioned to determine how many skiers with the 4-area ticket used each mountain, and the parties allocated revenues from the ticket sales in accordance with the survey's results.

In the next four seasons, Ski Co. and Highlands used such surveys to allocate the revenues from the 4-area, 6-day ticket. Highlands' share of the revenues from the ticket was 17.5% in 1973–1974, 18.5% in 1974–1975, 16.8% in 1975–1976, and 13.2% in 1976–1977.[8] During these four seasons, Ski Co. did not offer its own 3-area, multiday ticket in compe-

---

[8] *Id.*, at 167. Highlands' share of the total market during those seasons, as measured in skier visits was 15.8% in 1973–1974, 17.1% in 1974–1975, 17.4% in 1975–1976, and 20.5% in 1976–1977. Record Ex. No. 97, App. 183.

tition with the all-Aspen ticket.[9] By 1977, multiarea tickets accounted for nearly 35% of the total market. *Id.*, at 614, 1367. Holders of multiarea passes also accounted for additional daily ticket sales to persons skiing with them.

Between 1962 and 1977, Ski Co. and Highlands had independently offered various mixes of 1-day, 3-day, and 6-day passes at their own mountains.[10] In every season except one, however, they had also offered some form of all-Aspen, 6-day ticket, and divided the revenues from those sales on the basis of usage. Nevertheless, for the 1977–1978 season, Ski Co. offered to continue the all-Aspen ticket only if Highlands would accept a 13.2% fixed share of the ticket's revenues.

Although that had been Highlands' share of the ticket revenues in 1976–1977, Highlands contended that that season was an inaccurate measure of its market performance since it had been marked by unfavorable weather and an unusually low number of visiting skiers.[11] Moreover, Highlands wanted to continue to divide revenues on the basis of actual usage, as that method of distribution allowed it to compete

---

[9] In 1975, the Colorado Attorney General filed a complaint against Ski Co. and Highlands alleging, in part, that the negotiations over the 4-area ticket had provided them with a forum for price fixing in violation of § 1 of the Sherman Act and that they had attempted to monopolize the market for downhill skiing services in Aspen in violation of § 2. Record Ex. X. In 1977, the case was settled by a consent decree that permitted the parties to continue to offer the 4-area ticket provided that they set their own ticket prices unilaterally before negotiating its terms. Tr. 229–231.

[10] About 15–20% of each company's ticket revenues were derived from sales to tour operators at a wholesale discount of 10–15%, while 80–85% of the ticket revenues were derived from sales to skiers in Aspen. *Id.*, at 623, 1772.

[11] The 1976–1977 season was "a no snow year." There were less than half as many skier visits (529,800) in that season as in either 1975–1976 (1,238,500) or 1977–1978 (1,273,400). Record Ex. No. 97, App. 183. In addition, Highlands opened earlier than Ski Co.'s mountains and its patrons skied off all the good snow. Ski Co. waited until January and had a better base for the rest of the season. Tr. 228.

for the daily loyalties of the skiers who had purchased the tickets. Tr. 172. Fearing that the alternative might be no interchangeable ticket at all, and hoping to persuade Ski Co. to reinstate the usage division of revenues, Highlands eventually accepted a fixed percentage of 15% for the 1977–1978 season. *Ibid.* No survey was made during that season of actual usage of the 4-area ticket at the two competitors' mountains.

In the 1970's the management of Ski Co. increasingly expressed their dislike for the all-Aspen ticket. They complained that a coupon method of monitoring usage was administratively cumbersome. They doubted the accuracy of the survey and decried the "appearance, deportment, [and] attitude" of the college students who were conducting it. *Id.*, at 1627. See also *id.*, at 398, 405–407, 959. In addition, Ski Co.'s president had expressed the view that the 4-area ticket was siphoning off revenues that could be recaptured by Ski Co. if the ticket was discontinued. *Id.*, at 586–587, 950, 960. In fact, Ski Co. had reinstated its 3-area, 6-day ticket during the 1977–1978 season, but that ticket had been outsold by the 4-area, 6-day ticket nearly two to one. *Id.*, at 613–614.

In March 1978, the Ski Co. management recommended to the board of directors that the 4-area ticket be discontinued for the 1978–1979 season. The board decided to offer Highlands a 4-area ticket provided that Highlands would agree to receive a 12.5% fixed percentage of the revenue—considerably below Highlands' historical average based on usage. *Id.*, at 396, 585–586. Later in the 1978–1979 season, a member of Ski Co.'s board of directors candidly informed a Highlands official that he had advocated making Highlands "an offer that [it] could not accept." *Id.*, at 361.

Finding the proposal unacceptable, Highlands suggested a distribution of the revenues based on usage to be monitored by coupons, electronic counting, or random sample surveys. *Id.*, at 188. If Ski Co. was concerned about who was to conduct the survey, Highlands proposed to hire disinterested

ticket counters at its own expense—"somebody like Price Waterhouse"—to count or survey usage of the 4-area ticket at Highlands. *Id.*, at 191. Ski Co. refused to consider any counterproposals, and Highlands finally rejected the offer of the fixed percentage.

As far as Ski Co. was concerned, the all-Aspen ticket was dead. In its place Ski Co. offered the 3-area, 6-day ticket featuring only its mountains. In an effort to promote this ticket, Ski Co. embarked on a national advertising campaign that strongly implied to people who were unfamiliar with Aspen that Ajax, Buttermilk, and Snowmass were the only ski mountains in the area. For example, Ski Co. had a sign changed in the Aspen Airways waiting room at Stapleton Airport in Denver. The old sign had a picture of the four mountains in Aspen touting "Four Big Mountains" whereas the new sign retained the picture but referred only to three. *Id.*, at 844, 847, 858–859.[12]

Ski Co. took additional actions that made it extremely difficult for Highlands to market its own multiarea package to replace the joint offering. Ski Co. discontinued the 3-day, 3-area pass for the 1978–1979 season,[13] and also refused to sell Highlands any lift tickets, either at the tour operator's discount or at retail. *Id.*, at 327.[14] Highlands finally developed

---

[12] Ski Co. circulated another advertisement to national magazines labeled "Aspen, More Mountains, More Fun." App. 184. The advertisement depicted the four mountains of Aspen, but labeled only Ajax, Buttermilk, and Snowmass. Buttermilk's label is erroneously placed directly over Highlands Mountain. Tr. 860, 1803.

[13] Highlands' owner explained that there was a key difference between the 3-day, 3-area ticket and the 6-day, 3-area ticket: "with the three day ticket, a person could ski on the . . . Aspen Skiing Corporation mountains for three days and then there would be three days in which he could ski on our mountain; but with the six-day ticket, we are absolutely locked out of those people." *Id.*, at 245. As a result of "tremendous consumer demand" for a 3-day ticket, Ski Co. reinstated it late in the 1978–1979 season, but without publicity or a discount off the daily rate. *Id.*, at 622.

[14] In the 1977–1978 negotiations, Ski Co. previously had refused to consider the sale of any tickets to Highlands, noting that it was "obviously not

an alternative product, the "Adventure Pack," which consisted of a 3-day pass at Highlands and three vouchers, each equal to the price of a daily lift ticket at a Ski Co. mountain. The vouchers were guaranteed by funds on deposit in an Aspen bank, and were redeemed by Aspen merchants at full value. *Id.*, at 329–334. Ski Co., however, refused to accept them.

Later, Highlands redesigned the Adventure Pack to contain American Express Traveler's Checks or money orders instead of vouchers. Ski Co. eventually accepted these negotiable instruments in exchange for daily lift tickets.[15] *Id.*, at 505, 507, 549. Despite some strengths of the product, the Adventure Pack met considerable resistance from tour operators and consumers who had grown accustomed to the convenience and flexibility provided by the all-Aspen ticket. *Id.*, at 784–785, 1041.

Without a convenient all-Aspen ticket, Highlands basically "becomes a day ski area in a destination resort." *Id.*, at 1425. Highlands' share of the market for downhill skiing services in Aspen declined steadily after the 4-area ticket based on usage was abolished in 1977: from 20.5% in 1976–1977, to 15.7% in 1977–1978, to 13.1% in 1978–1979, to

---

interested in helping sell" a package competitive with the 3-area ticket. Record Ex. No. 16; Tr. 269–270. Later, in the 1978–1979 negotiations, Ski Co.'s vice president of finance told a Highlands official that "[w]e will not have anything to do with a four-area ticket sponsored by the Aspen Highlands Skiing Corporation." *Id.*, at 335. When the Highlands official inquired why Ski Co. was taking this position considering that Highlands was willing to pay full retail value for the daily lift tickets, the Ski Co. official answered tersely: "we will not support our competition." *Ibid.*

[15] Of course, there was nothing to identify Highlands as the source of these instruments, unless someone saw the skier "taking it out of an Adventure Pack envelope." *Id.*, at 505. For the 1981–1982 season, Ski Co. set its single ticket price at $22 and discounted the 3-area, 6-day ticket to $114. According to Highlands, this price structure made the Adventure Pack unprofitable. *Id.*, at 535.

12.5% in 1979–1980, to 11% in 1980–1981.[16]    Record Ex. No. 97, App. 183.    Highlands' revenues from associated ski-ing services like the ski school, ski rentals, amateur racing events, and restaurant facilities declined sharply as well.[17]

## II

In 1979, Highlands filed a complaint in the United States District Court for the District of Colorado naming Ski Co. as a defendant.    Among various claims,[18] the complaint alleged that Ski Co. had monopolized the market for downhill skiing services at Aspen in violation of § 2 of the Sherman Act, and prayed for treble damages.    The case was tried to a jury which rendered a verdict finding Ski Co. guilty of the § 2 violation and calculating Highlands' actual damages at $2.5 million.    App. 187–190.

In her instructions to the jury, the District Judge ex-plained that the offense of monopolization under § 2 of the Sherman Act has two elements: (1) the possession of monop-oly power in a relevant market, and (2) the willful acquisition, maintenance, or use of that power by anticompetitive or exclusionary means or for anticompetitive or exclusionary

---

[16] In these seasons, Buttermilk Mountain, in particular, substantially in-creased its market share at the expense of Highlands.    Record Ex. BB; Tr. 1806.

[17] See Record Ex. No. 91; Tr. 488, 571–572, 692–694, 698, 701–702. Highlands' ski school had an outstanding reputation, and its share of the ski school market had always outperformed Highlands' share of the downhill skiing market.    Id., at 1822.    Even some Ski Co. officials had sent their children to ski school at Highlands.    Id., at 560–570, 588.    After the elimi-nation of the 4-area ticket, however, families or groups purchasing 3-area tickets were reluctant to enroll a beginner among them in the Highlands ski school when the more experienced skiers would have to leave to ski at Ajax, Buttermilk, or Snowmass.    Id., at 571.

[18] Highlands also alleged that Ski Co. had conspired with various third parties in violation of § 1 of the Sherman Act.    The District Court allowed this claim to go to the jury which rendered a verdict in Ski Co.'s favor. App. 189.

purposes.[19]   Tr. 2310.   Although the first element was vigorously disputed at the trial and in the Court of Appeals, in this Court Ski Co. does not challenge the jury's special verdict finding that it possessed monopoly power.[20]   Nor does Ski Co. criticize the trial court's instructions to the jury concerning the second element of the § 2 offense.

On this element, the jury was instructed that it had to consider whether "Aspen Skiing Corporation willfully acquired, maintained, or used that power by anti-competitive or exclusionary means or for anti-competitive or exclusionary purposes."   App. 181.   The instructions elaborated:

"In considering whether the means or purposes were anti-competitive or exclusionary, you must draw a distinction here between practices which tend to exclude or restrict competition on the one hand and the success of a business which reflects only a superior product, a well-run business, or luck, on the other.   The line between legitimately gained monopoly, its proper use and maintenance, and improper conduct has been described in various ways.   It has been said that obtaining or maintaining monopoly power cannot represent monopolization if the power was gained and maintained by conduct that was honestly industrial.   Or it is said that monopoly power which is thrust upon a firm due to its

[19] In *United States* v. *Grinnell Corp.*, 384 U. S. 563, 570–571 (1966), we explained:

"The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."

[20] The jury found that the relevant product market was "[d]ownhill skiing at destination ski resorts," that the "Aspen area" was a relevant geographic submarket, and that during the years 1977–1981, Ski Co. possessed monopoly power, defined as the power to control prices in the relevant market or to exclude competitors.   See App. 187–188.

superior business ability and efficiency does not constitute monopolization.

"For example, a firm that has lawfully acquired a monopoly position is not barred from taking advantage of scale economies by constructing a large and efficient factory. These benefits are a consequence of size and not an exercise of monopoly power. Nor is a corporation which possesses monopoly power under a duty to cooperate with its business rivals. Also a company which possesses monopoly power and which refuses to enter into a joint operating agreement with a competitor or otherwise refuses to deal with a competitor in some manner does not violate Section 2 if valid business reasons exist for that refusal.

"In other words, if there were legitimate business reasons for the refusal, then the defendant, even if he is found to possess monopoly power in a relevant market, has not violated the law. We are concerned with conduct which unnecessarily excludes or handicaps competitors. This is conduct which does not benefit consumers by making a better product or service available—or in other ways—and instead has the effect of impairing competition.

"To sum up, you must determine whether Aspen Skiing Corporation gained, maintained, or used monopoly power in a relevant market by arrangements and policies which rather than being a consequence of a superior product, superior business sense, or historic element, were designed primarily to further any domination of the relevant market or sub-market." *Id.*, at 181–182.

The jury answered a specific interrogatory finding the second element of the offense as defined in these instructions.[21]

---

[21] It answered this interrogatory affirmatively:

"Willful Acquisition, Maintenance or Use of Monopoly Power: Do you find by a preponderance of the evidence that the defendants willfully

Ski Co. filed a motion for judgment notwithstanding the verdict, contending that the evidence was insufficient to support a § 2 violation as a matter of law. In support of that motion, Ski Co. incorporated the arguments that it had advanced in support of its motion for a directed verdict, at which time it had primarily contested the sufficiency of the evidence on the issue of monopoly power. Counsel had, however, in the course of the argument at that time, stated: "Now, we also think, Judge, that there clearly cannot be a requirement of cooperation between competitors." Tr. 1452.[22] The District Court denied Ski Co.'s motion and entered a judgment awarding Highlands treble damages of $7,500,000, costs, and attorney's fees.[23] App. 191–192.

---

acquired, maintained or used monopoly power by anticompetitive or exclusionary means or for anticompetitive or exclusionary purposes, rather than primarily as a consequence of a superior product, superior business sense, or historic accident?" *Id.*, at 189.

[22] Counsel also appears to have argued that Ski Co. was under a legal obligation to refuse to participate in any joint marketing arrangement with Highlands:

"Aspen Skiing Corporation is required to compete. It is required to make independent decisions. It is required to price its own product. It is required to make its own determination of the ticket that it chooses to offer and the tickets that it chooses not to offer." Tr. 1454.

In this Court, Ski Co. does not question the validity of the joint marketing arrangement under § 1 of the Sherman Act. Thus, we have no occasion to consider the circumstances that might permit such combinations in the skiing industry. See generally *National Collegiate Athletic Assn.* v. *Board of Regents of Univ. of Okla.*, 468 U. S. 85, 113–115 (1984); *Broadcast Music, Inc.*, v. *Columbia Broadcasting System, Inc.*, 441 U. S. 1, 18–23 (1979); *Continental T. V., Inc.* v. *GTE Sylvania, Inc.*, 433 U. S. 36, 51–57 (1977).

[23] The District Court also entered an injunction requiring the parties to offer jointly a 4-area, 6-out-of-7-day coupon booklet substantially identical to the "Ski the Summit" booklet accepted by Ski Co. at its Breckenridge resort in Summit County, Colorado. See n. 30, *infra*. See also *supra*, at 589. The injunction was initially for a 3-year period, but was later extended through the 1984–1985 season by stipulation of the parties. Highlands represents that "it will not seek an extension of the injunction." Brief for Respondent 1, n. 1. No question is raised concerning the character of the injunctive relief ordered by the District Court.

The Court of Appeals affirmed in all respects. 738 F. 2d 1509 (CA10 1984). The court advanced two reasons for rejecting Ski Co.'s argument that "'there was insufficient evidence to present a jury issue of monopolization because, as a matter of law, the conduct at issue was pro-competitive conduct that a monopolist could lawfully engage in.'"[24] First, relying on *United States* v. *Terminal Railroad Assn. of St. Louis*, 224 U. S. 383 (1912), the Court of Appeals held that the multiday, multiarea ticket could be characterized as an "essential facility" that Ski Co. had a duty to market jointly with Highlands. 738 F. 2d, at 1520–1521. Second, it held that there was sufficient evidence to support a finding that Ski Co.'s intent in refusing to market the 4-area ticket, "considered together with its other conduct," was to create or maintain a monopoly. *Id.*, at 1522.

In its review of the evidence on the question of intent, the Court of Appeals considered the record "as a whole" and concluded that it was not necessary for Highlands to prove that each allegedly anticompetitive act was itself sufficient to demonstrate an abuse of monopoly power. *Id.*, at 1522, n. 18.[25] The court noted that by "refusing to cooperate" with Highlands, Ski Co. "became the only business in Aspen that could offer a multi-day multi-mountain skiing experience"; that the refusal to offer a 4-mountain ticket resulted in "skiers' frustration over its unavailability"; that there was apparently no valid business reason for refusing to accept the coupons in Highlands' Adventure Pack; and that after Highlands had modified its Adventure Pack to meet Ski Co.'s objections, Ski Co. had increased its single ticket price to $22 "thereby making it unprofitable . . . to market [the] Adventure Pack." *Id.*, at 1521–1522. In reviewing Ski Co.'s argument that it was entitled to a directed verdict, the Court of Appeals assumed that the jury had resolved all contested questions of fact in Highlands' favor.

---

[24] 738 F. 2d, at 1516–1517 (quoting Ski Co.'s brief below).

[25] See *Continental Ore Co.* v. *Union Carbide & Carbon Corp.*, 370 U. S. 690, 699 (1962); *Associated Press* v. *United States*, 326 U. S. 1, 14 (1945).

## III

In this Court, Ski Co. contends that even a firm with monopoly power has no duty to engage in joint marketing with a competitor, that a violation of § 2 cannot be established without evidence of substantial exclusionary conduct, and that none of its activities can be characterized as exclusionary. It also contends that the Court of Appeals incorrectly relied on the "essential facilities" doctrine and that an "anticompetitive intent" does not transform nonexclusionary conduct into monopolization. In response, Highlands submits that, given the evidence in the record, it is not necessary to rely on the "essential facilities" doctrine in order to affirm the judgment.[26] Tr. of Oral Arg. 34.

"The central message of the Sherman Act is that a business entity must find new customers and higher profits through internal expansion—that is, by competing successfully rather than by arranging treaties with its competitors." *United States* v. *Citizens & Southern National Bank,* 422 U. S. 86, 116 (1975). Ski Co., therefore, is surely correct in submitting that even a firm with monopoly power has no general duty to engage in a joint marketing program with a competitor. Ski Co. is quite wrong, however, in suggesting that the judgment in this case rests on any such proposition of law. For the trial court unambiguously instructed the jury that a firm possessing monopoly power has no duty to cooperate with its business rivals. *Supra,* at 596–597.

---

[26] Highlands also contends that Ski Co.'s present contentions were not properly raised in the District Court. In that court, Ski Co. primarily questioned whether the evidence supported a finding that it possessed monopoly power in a properly defined market. In this Court, on the other hand, Ski Co.'s entire argument relates to the question whether it misused that power. Nevertheless, we agree with the Court of Appeals' conclusion, 738 F. 2d, at 1517–1518, that Ski Co.'s motion for a directed verdict did raise the question whether the judgment improperly rested on an assumption that § 2 required a monopolist to cooperate with its rivals.

The absence of an unqualified duty to cooperate does not mean that every time a firm declines to participate in a particular cooperative venture, that decision may not have evidentiary significance, or that it may not give rise to liability in certain circumstances. The absence of a duty to transact business with another firm is, in some respects, merely the counterpart of the independent businessman's cherished right to select his customers and his associates. The high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified.[27]

In *Lorain Journal Co.* v. *United States*, 342 U. S. 143 (1951), we squarely held that this right was not unqualified. Between 1933 and 1948 the publisher of the Lorain Journal, a newspaper, was the only local business disseminating news and advertising in that Ohio town. In 1948, a small radio station was established in a nearby community. In an effort to destroy its small competitor, and thereby regain its "pre-1948 substantial monopoly over the mass dissemination of all news and advertising," the Journal refused to sell advertising to persons that patronized the radio station. *Id.*, at 153.

In holding that this conduct violated § 2 of the Sherman Act, the Court dispatched the same argument raised by the monopolist here:

> "The publisher claims a right as a private business concern to select its customers and to refuse to accept advertisements from whomever it pleases. We do not dispute that general right. 'But the word "right" is one of the most deceptive of pitfalls; it is so easy to slip from a qualified meaning in the premise to an unqualified one in the conclusion. Most rights are qualified.' *Ameri-*

---

[27] Under § 1 of the Sherman Act, a business "generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Monsanto Co.* v. *Spray-Rite Service Corp.*, 465 U. S. 752, 761 (1984); *United States* v. *Colgate & Co.*, 250 U. S. 300, 307 (1919).

*can Bank & Trust Co.* v. *Federal Bank,* 256 U. S. 350,
358. The right claimed by the publisher is neither
absolute nor exempt from regulation. Its exercise as a
purposeful means of monopolizing interstate commerce
is prohibited by the Sherman Act. The operator of the
radio station, equally with the publisher of the news-
paper, is entitled to the protection of that Act. *'In the
absence of any purpose to create or maintain a monop-
oly,* the act does not restrict the long recognized right of
trader or manufacturer engaged in an entirely private
business, freely to exercise his own independent discre-
tion as to parties with whom he will deal.' (Emphasis
supplied.) *United States* v. *Colgate & Co.,* 250 U. S.
300, 307. See *Associated Press* v. *United States,* 326
U. S. 1, 15; *United States* v. *Bausch & Lomb Co.,* 321
U. S. 707, 721–723." 342 U. S., at 155.

The Court approved the entry of an injunction ordering the
Journal to print the advertisements of the customers of its
small competitor.

In *Lorain Journal,* the violation of § 2 was an "attempt to
monopolize," rather than monopolization, but the question of
intent is relevant to both offenses. In the former case it is
necessary to prove a "specific intent" to accomplish the for-
bidden objective—as Judge Hand explained, "an intent which
goes beyond the mere intent to do the act." *United States* v.
*Aluminum Co. of America,* 148 F. 2d 416, 432 (CA2 1945).
In the latter case evidence of intent is merely relevant to the
question whether the challenged conduct is fairly character-
ized as "exclusionary" or "anticompetitive"—to use the words
in the trial court's instructions—or "predatory," to use a
word that scholars seem to favor. Whichever label is used,
there is agreement on the proposition that "no monopolist
monopolizes unconscious of what he is doing."[28] As Judge

---

[28] "In order to fall within § 2, the monopolist must have both the power to
monopolize, and the intent to monopolize. To read the passage as de-
manding any 'specific,' intent, makes nonsense of it, for no monopolist

Bork stated more recently: "Improper exclusion (exclusion not the result of superior efficiency) is always deliberately intended."[29]

The qualification on the right of a monopolist to deal with whom he pleases is not so narrow that it encompasses no more than the circumstances of *Lorain Journal*. In the actual case that we must decide, the monopolist did not merely reject a novel offer to participate in a cooperative venture that had been proposed by a competitor. Rather, the monopolist elected to make an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years. The all-Aspen, 6-day ticket with revenues allocated on the basis of usage was first developed when three independent companies operated three different ski mountains in the Aspen area. *Supra*, at 589, and n. 7. It continued to provide a desirable option for skiers when the market was enlarged to include four mountains, and when the character of the market was changed by Ski Co.'s acquisition of monopoly power. Moreover, since the record discloses that interchangeable tickets are used in other multimountain areas which apparently are competitive,[30] it seems appropriate to infer that such tickets satisfy consumer demand in free competitive markets.

---

monopolizes unconscious of what he is doing. So here, 'Alcoa' meant to keep, and did keep, that complete and exclusive hold upon the ingot market with which it started. That was to 'monopolize' that market, however innocently it otherwise proceeded." *United States* v. *Aluminum Co. of America*, 148 F. 2d, at 432.

[29] R. Bork, The Antitrust Paradox 160 (1978) (hereinafter Bork).

[30] Ski Co. itself participates in interchangeable ticket programs in at least two other markets. For example, since 1970, Ski Co. has operated the Breckenridge resort in Summit County, Colorado. Breckenridge participates in the "Ski the Summit" 4-area interchangeable coupon booklet which allows the skier to ski at any of the four mountains in the region: Breckenridge, Copper Mountain, Keystone, and Arapahoe Basin. Tr. 188, 590, 966, 1070–1081. In the 1979–1980 season Keystone and Arapahoe Basin—which are jointly operated—had about 40% of the Summit County market, and the other two ski mountains each had a market share of about

Ski Co.'s decision to terminate the all-Aspen ticket was thus a decision by a monopolist to make an important change in the character of the market.[31] Such a decision is not necessarily anticompetitive, and Ski Co. contends that neither its decision, nor the conduct in which it engaged to implement that decision, can fairly be characterized as exclusionary in this case. It recognizes, however, that as the case is presented to us, we must interpret the entire record in the light most favorable to Highlands and give to it the benefit of all inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn. *Continental Ore Co.* v. *Union Carbide & Carbon Corp.*, 370 U. S. 690, 696 (1962).

Moreover, we must assume that the jury followed the court's instructions. The jury must, therefore, have drawn a distinction "between practices which tend to exclude or restrict competition on the one hand, and the success of a business which reflects only a superior product, a well-run business, or luck, on the other." *Supra,* at 596. Since the jury was unambiguously instructed that Ski Co.'s refusal to

---

30%. *Id.*, at 1100. During the relevant period of time, Ski Co. also operated Blackcomb Mountain, northeast of Vancouver, British Columbia, which has an interchangeable ticket arrangement with nearby Whistler Mountain, an independently operated facility. *Id.*, at 369, 873–874. Interchangeable lift tickets apparently are also available in some European skiing areas. See n. 7, *supra;* Tr. 720.

[31] "In any business, patterns of distribution develop over time; these may reasonably be thought to be more efficient than alternative patterns of distribution that do not develop. The patterns that do develop and persist we may call the optimal patterns. By disturbing optimal distribution patterns one rival can impose costs upon another, that is, force the other to accept higher costs." Bork 156.

In § 1 cases where this Court has applied the *per se* approach to invalidity to concerted refusals to deal, "the boycott often cut off access to a supply, facility or market necessary to enable the boycotted firm to compete, . . . and frequently the boycotting firms possessed a dominant position in the relevant market." *Northwest Wholesale Stationers, Inc.* v. *Pacific Stationery & Printing Co., ante,* at 294.

deal with Highlands "does not violate Section 2 if valid business reasons exist for that refusal," *supra*, at 597, we must assume that the jury concluded that there were no valid business reasons for the refusal. The question then is whether that conclusion finds support in the record.

## IV

The question whether Ski Co.'s conduct may properly be characterized as exclusionary cannot be answered by simply considering its effect on Highlands. In addition, it is relevant to consider its impact on consumers and whether it has impaired competition in an unnecessarily restrictive way.[32] If a firm has been "attempting to exclude rivals on some basis other than efficiency,"[33] it is fair to characterize its behavior as predatory. It is, accordingly, appropriate to examine the effect of the challenged pattern of conduct on consumers, on Ski Co.'s smaller rival, and on Ski Co. itself.

### *Superior Quality of the All-Aspen Ticket*

The average Aspen visitor "is a well-educated, relatively affluent, experienced skier who has skied a number of times in the past . . . ." Tr. 764. Over 80% of the skiers visiting the resort each year have been there before—40% of these repeat visitors have skied Aspen at least five times. *Id.*, at 768. Over the years, they developed a strong demand for the 6-day, all-Aspen ticket in its various refinements. Most experienced skiers quite logically prefer to purchase their tickets at once for the whole period that they will spend at the resort; they can then spend more time on the slopes and enjoying après-ski amenities and less time standing in ticket lines. The 4-area attribute of the ticket allowed the skier to

---

[32] "Thus, 'exclusionary' comprehends at the most behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way." 3 P. Areeda & D. Turner, Antitrust Law 78 (1978).

[33] Bork 138.

purchase his 6-day ticket in advance while reserving the right to decide in his own time and for his own reasons which mountain he would ski on each day. It provided convenience and flexibility, and expanded the vistas and the number of challenging runs available to him during the week's vacation.[34]

While the 3-area, 6-day ticket offered by Ski Co. possessed some of these attributes, the evidence supports a conclusion that consumers were adversely affected by the elimination of the 4-area ticket. In the first place, the actual record of competition between a 3-area ticket and the all-Aspen ticket in the years after 1967 indicated that skiers demonstrably preferred four mountains to three. *Supra*, at 589–590, 592. Highlands' expert marketing witness testified that many of the skiers who come to Aspen want to ski the four mountains, and the abolition of the 4-area pass made it more difficult to satisfy that ambition. Tr. 775. A consumer survey undertaken in the 1979–1980 season indicated that 53.7% of the respondents wanted to ski Highlands, but would not; 39.9% said that they would not be skiing at the mountain of their choice because their ticket would not permit it. Record Ex. No. 75, pp. 36–37.

Expert testimony and anecdotal evidence supported these statistical measures of consumer preference. A major whole-

---

[34] Highlands' expert marketing witness testified that visitors to the Aspen resort "are looking for a variety of skiing experiences, partly because they are going to be there for a week and they are going to get bored if they ski in one area for very long; and also they come with people of varying skills. They need some variety of slopes so that if they want to go out and ski the difficult areas, their spouses or their buddies who are just starting out skiing can go on the bunny hill or the not-so-difficult slopes." Tr. 765. The owner of a condominium management company added: "The guest is coming for a first-class destination ski experience, and part of that, I think, is the expectation of perhaps having available to him the ability to ski all of what is there; *i. e.*, four mountains vs. three mountains. It helps enhance the quality of the vacation experience." *Id.*, at 720. See also *id.*, at 685.

sale tour operator asserted that he would not even consider marketing a 3-area ticket if a 4-area ticket were available.[35] During the 1977–1978 and 1978–1979 seasons, people with Ski Co.'s 3-area ticket came to Highlands "on a very regular basis" and attempted to board the lifts or join the ski school.[36] Highlands officials were left to explain to angry skiers that they could only ski at Highlands or join its ski school by paying for a 1-day lift ticket. Even for the affluent, this was an irritating situation because it left the skier the option of either wasting 1 day of the 6-day, 3-area pass or obtaining a refund which could take all morning and entailed the forfeit of the 6-day discount.[37] An active officer in the Atlanta Ski Club testified that the elimination of the 4-area pass "infuriated" him. Tr. 978.

*Highlands' Ability to Compete*

The adverse impact of Ski Co.'s pattern of conduct on Highlands is not disputed in this Court. Expert testimony described the extent of its pecuniary injury. The evidence concerning its attempt to develop a substitute product either by buying Ski Co.'s daily tickets in bulk, or by marketing its

---

[35] "Our philosophy is that . . . to offer [Aspen] as a premier ski resort, our clients should be offered all of the terrain. Therefore, we would never consciously consider offering a three-mountain ticket if there were a four-mountain ticket available." *Id.*, at 1026.

[36] *Id.*, at 356, 492, 572, 679, 1001–1002. For example, the marketing director of Highlands' ski school reported that one frustrated consumer was a dentist from "the Des Moines area [who] came out with two of his children, and he had been told by our base lift operator that he could not board. He became somewhat irate and she had referred him to my office, which is right there on the ski slopes. He came into my office and started out, 'Well, I want to go skiing here, and I don't understand why I can't.' When we got the situation slowed down and explained that there were two different tickets, well, what came out is irritation occurred because he had intended when he came to Aspen to be able to ski all areas . . . ." *Id.*, at 356.

[37] The refund policy was cumbersome, and poorly publicized. *Id.*, at 994, 1044, 1053.

own Adventure Pack, demonstrates that it tried to protect itself from the loss of its share of the patrons of the all-Aspen ticket. The development of a new distribution system for providing the experience that skiers had learned to expect in Aspen proved to be prohibitively expensive. As a result, Highlands' share of the relevant market steadily declined after the 4-area ticket was terminated. The size of the damages award also confirms the substantial character of the effect of Ski Co.'s conduct upon Highlands.[38]

*Ski Co.'s Business Justification*

Perhaps most significant, however, is the evidence relating to Ski Co. itself, for Ski Co. did not persuade the jury that its conduct was justified by any normal business purpose. Ski Co. was apparently willing to forgo daily ticket sales both to skiers who sought to exchange the coupons contained in Highlands' Adventure Pack, and to those who would have purchased Ski Co. daily lift tickets from Highlands if Highlands had been permitted to purchase them in bulk. The jury may well have concluded that Ski Co. elected to forgo these short-run benefits because it was more interested in reducing competition in the Aspen market over the long run by harming its smaller competitor.

That conclusion is strongly supported by Ski Co.'s failure to offer any efficiency justification whatever for its pattern of conduct.[39] In defending the decision to terminate the jointly

---

[38] In considering the competitive effect of Ski Co.'s refusal to deal or cooperate with Highlands, it is not irrelevant to note that similar conduct carried out by the concerted action of three independent rivals with a similar share of the market would constitute a *per se* violation of § 1 of the Sherman Act. See *Northwest Wholesale Stationers, Inc.* v. *Pacific Stationery & Printing Co., ante,* at 294. Cf. *Lorain Journal Co.* v. *United States,* 342 U. S. 143, 154 (1951).

[39] "The law can usefully attack this form of predation only when there is evidence of specific intent to drive others from the market by means other than superior efficiency and when the predator has overwhelming market size, perhaps 80 or 90 percent. Proof of specific intent to engage in preda-

offered ticket, Ski Co. claimed that usage could not be properly monitored. The evidence, however, established that Ski Co. itself monitored the use of the 3-area passes based on a count taken by lift operators, and distributed the revenues among its mountains on that basis.[40] Ski Co. contended that coupons were administratively cumbersome, and that the survey takers had been disruptive and their work inaccurate. Coupons, however, were no more burdensome than the credit cards accepted at Ski Co. ticket windows. Tr. 330–331. Moreover, in other markets Ski Co. itself participated in interchangeable lift tickets using coupons, n. 30, *supra*. As for the survey, its own manager testified that the problems were much overemphasized by Ski Co. officials, and were mostly resolved as they arose. Tr. 663–667, 673. Ski Co.'s explanation for the rejection of Highlands' offer to hire—at its own expense—a reputable national accounting firm to audit usage of the 4-area tickets at Highlands' mountain, was that there was no way to "control" the audit. *Id.*, at 598.

In the end, Ski Co. was pressed to justify its pattern of conduct on a desire to disassociate itself from—what it con-

---

tion may be in the form of statements made by the officers or agents of the company, evidence that the conduct was used threateningly and did not continue when a rival capitulated, or *evidence that the conduct was not related to any apparent efficiency*. These matters are not so difficult of proof as to render the test overly hard to meet." Bork 157 (emphasis added).

[40] Under the Ski Co. system, each skier's ticket, whether a daily or weekly ticket, is punched before he goes out on the slopes for the day. Revenues are distributed between the mountains on the basis of this count. Tr. 650–651. Ski Co.'s vice president for finance testified that Ski Co. "would never consider" a system like that for monitoring usage on a 4-area ticket: "it's fine to approximate within your own company." *Id.*, at 599. The United States Forest Service, however, required the submission of financial information on a mountain-by-mountain basis as a condition of the permits issued for each mountain. *Id.*, at 643, 945. A lift operator at Ajax conceded that the survey count during the years of the 4-area ticket was "generally pretty close" to the count made by Ski Co.'s staff. *Id.*, at 1627.

sidered—the inferior skiing services offered at Highlands. *Id.*, at 401, 422. The all-Aspen ticket based on usage, however, allowed consumers to make their own choice on these matters of quality. Ski Co.'s purported concern for the relative quality of Highlands' product was supported in the record by little more than vague insinuations, and was sharply contested by numerous witnesses. Moreover, Ski Co. admitted that it was willing to associate with what it considered to be inferior products in other markets. *Id.*, at 964.

Although Ski Co.'s pattern of conduct may not have been as "'bold, relentless, and predatory'" as the publisher's actions in *Lorain Journal*,[41] the record in this case comfortably supports an inference that the monopolist made a deliberate effort to discourage its customers from doing business with its smaller rival. The sale of its 3-area, 6-day ticket, particularly when it was discounted below the daily ticket price, deterred the ticket holders from skiing at Highlands.[42] The refusal to accept the Adventure Pack coupons in exchange for daily tickets was apparently motivated entirely by a decision to avoid providing any benefit to Highlands even though accepting the coupons would have entailed no cost to Ski Co. itself, would have provided it with immediate benefits, and would have satisfied its potential customers. Thus the evidence supports an inference that Ski Co. was not motivated by efficiency concerns and that it was willing to sacrifice

---

[41] *Lorain Journal Co.* v. *United States*, 342 U. S., at 149 (quoting opinion below, 92 F. Supp. 794, 796 (ND Ohio 1950)).

[42] "[W]hy didn't they buy an individual daily lift ticket at Aspen Highlands? . . . For those who had bought six-day tickets, I think despite the fact that they are all relatively affluent—a lot of them are relatively affluent when they go to Aspen—they are all sort of managerial types and they seem to be pretty cautious. Certainly the comments that I have had from individual skiers and from the tour operators, club people that I have talked to—they are pretty careful with their money and they would feel—these are the people who will buy the six-day, three-area ticket that giving up one of those days and going over to ski at Aspen Highlands would mean spending extra money." Tr. 777.

short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival.[43]

Because we are satisfied that the evidence in the record,[44] construed most favorably in support of Highlands' position, is adequate to support the verdict under the instructions given by the trial court, the jugment of the Court of Appeals is

*Affirmed.*

JUSTICE WHITE took no part in the decision of this case.

.

---

[43] The Ski Co. advertising that conveyed the impression that there were only three skiing mountains in Aspen, *supra*, at 593, and n. 12, is consistent with this conclusion, even though this evidence would not be sufficient in itself to sustain the judgment.

[44] Given our conclusion that the evidence amply supports the verdict under the instructions as given by the trial court, we find it unnecessary to consider the possible relevance of the "essential facilities" doctrine, or the somewhat hypothetical question whether nonexclusionary conduct could ever constitute an abuse of monopoly power if motivated by an anticompetitive purpose. If, as we have assumed, no monopolist monopolizes unconscious of what he is doing, that case is unlikely to arise.